UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| ST. LOUIS UNIVERSITY a/k/a SAINT LOUIS UNIVERSITY, | ) ) ) | |
| Plaintiff, | ) ) | |
| v. | ) ) | No. 4:11-CV-01367-AGF |
| ARNE DUNCAN, et al., | ) ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

In an administrative proceeding, the U.S. Secretary of Education ("Secretary")

determined that St. Louis University ("SLU") improperly disbursed more than $2.8

million in federal student aid money during the 1994 to 1996 school years, in violation of

Title IV of the Higher Education Act of 1965 ("Title IV"), 20 U.S.C. §§ 1070 et seq. The

Secretary demanded that SLU pay the U.S. Department of Education ("Department")

back the $2.8 million, and SLU now asks the Court to set aside the Secretary's decision

under the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701, et seq. This Court's

review is limited to the administrative record. After careful review of the extensive

record, and for the reasons set forth below, the Court finds that the Secretary's decision is

supported by substantial evidence and reflects application of the proper legal standards.

Therefore, the Court will deny SLU's request for relief.

## BACKGROUND

This case turns on the statutory requirements that condition when a postsecondary

institution may award federal financial aid under Title IV to a student who, absent special circumstances, would be ineligible for such an award. The Title IV program at issue is the Federal Pell Grant program.

## I.     The Federal Pell Grant Program

The Federal Pell Grant program provides need-based grants to low-income students at participating postsecondary institutions. *See* 20 U.S.C. § 1070a. Unlike loans, these grants do not have to be repaid. The Pell Grant program is one of several Title IV programs which Congress has authorized the Secretary to administer. *Id.* § 1070(b). The Secretary reviews and certifies postsecondary institutions for Title IV eligibility. *Id.* § 1099c. An eligible postsecondary institution must then enter into a program participation agreement with the Secretary, in which the institution, as a fiduciary with direct access to and authority to disburse federal funds, agrees to comply with all statutory and regulatory requirements under Title IV. *Id.* § 1094.

The Secretary is also authorized to monitor and enforce participating institutions' Title IV compliance through final audit determinations and final program reviews. 20 U.S.C. § 1094(c); *see also Trs. of Calif. State Univ. v. Riley*, 74 F.3d 960, 965 (9th Cir. 1996) ("Under the authority of 20 U.S.C. § 1094, the Secretary has promulgated regulations governing the institutions participating in the various federal programs for financial assistance for students, including the Pell Grant Program.").

An institution may challenge a final audit determination or final program review in an administrative hearing, but the institution has the burden to prove, as applicable, that the "expenditures questioned or disallowed were proper" and that "the institution or

servicer complied with program requirements." 34 C.F.R. § 668.116(d). On review, the hearing official must issue a written decision explaining whether the final audit determination "was supportable, in whole or in part." *Id*. § 668.118(b). The hearing official may base any findings of fact "only on evidence properly presented before him, on matters given official notice, or on facts stipulated to by the parties." *Id*. § 668.118(c). Either party may appeal the hearing official's decision to the Secretary. *Id.* § 668.119. The decision of the Secretary is the final decision of the Department. *Id.* § 668.121.

## II.  Title IV's Need Analysis Provisions

The amount of a student's financial aid award is determined by Title IV's "need analysis" provisions. *See* 20 U.S.C. §§ 1087kk-1087vv. These provisions set forth a statutory formula that calculates a family's expected contribution to a student's educational expenses based on the family's net income and net assets. Expected family contribution ("EFC") is the linchpin of Title IV's need analysis. To qualify for need-based assistance, a student's education costs must exceed his EFC. *See id.* §§ 1070a(b) (Pell Grants), 1087kk (other Title IV programs). The size of a student's Pell Grant is then determined by subtracting the student's EFC from the statutory maximum Pell Grant amount for that award year. *Id.* § 1070a(b)(2)(A).

The statutory formula for calculating EFC is uniform, comprehensive, and extremely detailed. *See* 20 U.S.C. §§ 1087ll-1087vv. In general, the formula takes into account the family's available income and then provides for a series of deductions against that income, such as federal income taxes paid, allowances for social security taxes, an employment expense allowance, and an income protection allowance. *See, e.g.*, *id.* §

1087oo.  The income protection allowance constitutes the maximum deduction for general living expenses that may be taken into account in calculating EFC.  *Id.* § 1087oo (c)(4). The amount of income protection allowance is prescribed by the Secretary and updated annually based on increases in the Consumer Price Index.  *Id.* § 1087rr(b).  The amount differs depending on a family's size and the number of persons in the family attending college.  *Id.* § 1087oo (c)(4).

Notwithstanding the comprehensive need analysis formula, Title IV grants participating institutions some amount of discretion to adjust the statutory formula to account for an individual student's special circumstances.  This discretion is governed by section 1087tt(a), which, during the years at issue in this case, provided:

> Nothing in this part shall be interpreted as limiting the authority of the financial aid administrator, on the basis of adequate documentation, to make adjustments on a case-by-case basis to the cost of attendance or the values of the data items required to calculate the expected student or parent contribution (or both) to allow for treatment of an individual eligible applicant with special circumstances. However, this authority shall not be construed to permit aid administrators to deviate from the contributions expected in the absence of special circumstances. Special circumstances shall be conditions that differentiate an individual student from a class of students rather than conditions that exist across a class of students. Adequate documentation for such adjustments shall substantiate such special circumstances of individual students.

20 U.S.C. § 1087tt(a) (1994).

Although the Secretary has authority to enforce Title IV compliance generally, the Secretary is prohibited from prescribing regulations to carry out Title IV's need analysis provisions, including section 1087tt(a), except to update the amount of the income protection and other allowances, and to propose modifications in the need analysis methodology.  *See* 20 U.S.C. § 1087rr(a) ("Notwithstanding any other provision of law,

the Secretary shall not have the authority to prescribe regulations to carry out this part except (A) to prescribe updated tables in accordance with subsections (b) through (h) of this section; or (B) to propose modifications in the need analysis methodology required by this part.").

**III.**     **SLU's Implementation of Section 1087tt(a)**

In its briefs, SLU describes itself as a private Catholic, Jesuit university that participates in Title IV programs, including the Pell Grant program. Pursuant to section 1087tt(a), SLU implemented a policy allowing students to request adjustments to their EFC based on special circumstances. Students requested adjustments using a form entitled "Application for Consideration of Financial Aid Special Circumstances." The form asked students to list, among other things, medical and dental expenses; elementary and high school education expenses, including private or parochial school tuition; and average annual living expenses, including, for example, housing, food, insurance, utilities, debts, clothing, and transportation.

According to a declaration submitted by SLU's financial aid director, Harold Deuser, SLU's financial aid administrators "only made Professional Judgment adjustments for individual students and/or families who completed an individual 'Application for Consideration of Financial Aid Special Circumstances' form." (Administrative Record ("R.") at 262.) Deuser contended that financial aid administrators would engage in discussions with students about their circumstances prior to making adjustments, if needed, and that administrators documented adjustments by making a notation in the student's file. *Id.*

In making these adjustments, Deuser stated that it was "extremely important" to SLU that its institutional policies implementing section 1087tt(a) ensured that students "who are similarly situated are similarly treated." (R. at 260.) Thus, after reviewing the statutory requirements and various guidance documents from the Department, SLU made the policy decision to treat certain categories of expenses reported by a student as "automatic" special circumstances. *Id.* at 266.

## IV.    The Department's Audit of SLU

In January of 1997, the Department's Office of Inspector General ("OIG") initiated an audit of SLU's Pell Grants during the 1994 to 1996 award years. The OIG found that SLU used section 1087tt(a) to make adjustments for 46% of its Pell Grant recipients during these award years, whereas financial aid administrators nationally did so for only 4% of their Pell Grant recipients. (R. at 309.)

In its audit, the OIG extracted a sample of 139 students' files from a universe of the 2,200 students for whom SLU used a section 1087tt(a) adjustment to award Pell Grants in excess of the amount normally awardable under the statutory formula. The sample consisted of 50 students who received an adjusted Pell Grant during the 1994-1995 award year and 89 students who received an adjusted Pell Grant during the 1995-1996 award year.

Through interviews with SLU's financial aid administrators, including Deuser, and a review of SLU's records, the OIG found that SLU's practice was to make across-the-board adjustments for the following categories of expenses: medical and dental expenses, elementary and secondary school tuition, and annual living expenses in excess

of those already accounted for in the statutory formula. (R. at 3167-68.) The OIG accepted some of SLU's adjustments, including those based on elementary and secondary school tuition and medical and dental expenses exceeding 5% of a family's income. *Id.* at 312-13. Ultimately, the OIG determined that SLU improperly adjusted the financial aid awards of 126 of the 139 students, or 90% of the sample. *Id.* at 309. The OIG concluded that the amount of improperly disbursed funds for the 139 student sample was $167,347. *Id.* The OIG then extrapolated that amount to the universe of 2,200 students to estimate that the total amount of improperly disbursed funds for the 1994 to 1996 award years was $2,599,709. *Id.*

In July of 1997, the OIG cited its audits of SLU and other postsecondary institutions in a legislative proposal to Congress to amend section 1087tt(a). The proposal stated that financial aid administrators were "unreasonabl[y]" using professional judgment to deduct expenses that were "nonessential." (R. at 320.) The OIG recommended that section 1087tt(a) be amended to state that "[a]ny adjustments for additional expenses allowed because of special circumstances should be limited to instances where the student demonstrates the expenses were . . . incurred out of necessity." *Id.* Additionally, the OIG recommended that Congress grant the Secretary authority to regulate section 1087tt(a). *Id.* Congress did not adopt any of the OIG's recommendations.

The OIG audit was ultimately submitted to the Department's Federal Student Aid office ("FSA")[1] for review prior to a final audit determination. The FSA not only agreed

_____

[1] The FSA was formerly known as the Office of Student Financial Assistance Programs.

that SLU improperly exercised its authority under section 1087tt(a) to adjust students'
financial aid awards in the 1994 to 1996 award years, but went further to find that SLU's
liability was greater than that stated in the OIG's audit.

The FSA found that the OIG should not have accepted SLU's adjustments to
students' awards based on medical and dental expenses because SLU "made no
individual determination as to why deductions of medical expenses was appropriate,"
instead "allow[ing] across the board deductions for all medical and dental expenses." (R.
at 228.) Likewise, the FSA found that the OIG should not have accepted SLU's
adjustments based on all reported elementary and secondary school tuition because
"[t]uition may not be used to reduce a student's family income in the absence of
documentation of special circumstances justifying the reduction." *Id.* at 229.

The FSA concluded that the amount of improperly disbursed funds for the 139
student sample was $175,797, which, extrapolated to the universe of 2,200 students for
the 1994 to 1996 award years, amounted to "a total liability of $2,816,029 for an
estimated 2,016 improperly awarded students." (R. at 231-32.) Thus, the FSA issued a
final audit determination holding SLU liable for $2,816,029 and attaching its findings
with respect to each student in the sample.

## V.    <u>Administrative Proceedings</u>

SLU sought administrative review of the final audit determination under 34 C.F.R.
§ 668, Subpart H. SLU challenged both the FSA's finding of liability and the
methodology used to calculate the amount of liability.

During the first administrative proceeding before Chief Administrative Judge

Ernest Canellos ("Canellos I"), SLU stated that it had indeed defined certain medical and dental, elementary and secondary school tuition, and living expenses as "per se" special circumstances under section 1087tt(a). (R. at 3274-77.) In other words, SLU made an "advance judgment" that expenses falling within these categories would be treated as special circumstances warranting an adjustment for all students who reported them. *Id.* at 3272-73. But SLU argued that section 1087tt(a) gave financial aid administrators discretion to determine, in their professional judgment, that these categories of expenses constituted special circumstances. SLU emphasized that although the OIG sought to limit financial aid administrators' discretion under section 1087tt(a) in its July 1997 legislative proposal, Congress rejected the OIG's proposal.

After reviewing the record, Judge Canellos determined that SLU should be relieved of liability. Judge Canellos reasoned that the FSA's arguments in this case "parallel[ed]" the OIG's legislative proposal to Congress in July of 1997. (R. at 3446.) The "marked difference," however, was that the OIG's proposal presumed that section 1087tt(a) *permitted* SLU's actions. *Id.* Judge Canellos concluded that the Department could not argue "that the law proscribes the actions taken by [SLU] and, at the same time, argue to Congress that it needs to change the law to make such actions illegal." *Id.*

Given his finding that SLU was not liable, Judge Canellos did not need to reach SLU's methodology challenges. However, he noted that SLU "could have, if it wished, performed a full-file review to potentially establish lesser damages." (R. at 3446.)

The FSA appealed the Canellos I decision to the Secretary. The Secretary

remanded the matter for further review.[2]  The Secretary held that the record reflected that SLU's financial aid administrators considered medical and dental expenses, elementary and secondary school tuition, and living expenses that exceeded statutory income protection allowances as "per se special circumstances."  (R. at 3547.)  The Secretary held that the mandatory language of section 1087tt(a) did not permit SLU to define certain categories of expenses as "per se special circumstances" but required it to determine "on a case-by-case basis" that "special circumstances" exist and were supported by "adequate documentation."  *Id.*   The Secretary instructed the hearing official to determine, on remand, whether SLU had shown it satisfied these prerequisites in each case.  *Id.*

On remand ("Canellos II"), Judge Canellos ordered SLU to identify any case-by-case analysis it had used in determining whether special circumstances existed for each student, to identify where in the record documentation of special circumstances could be found, and to explain why the documentation was adequate for this purpose.  (R. at 4035-36.)  Judge Canellos also ordered the FSA to file a response brief.  *Id.*

SLU argued that its case-by-case analysis consisted of reviewing each Application for Consideration of Financial Aid Special Circumstances, one by one, before making adjustments.  SLU also offered a document entitled "Student-by-Student Analysis" in which it attempted to demonstrate, retrospectively, that the students at issue qualified for the award SLU gave them.  In this document, SLU performed post-hoc individualized

_____

[2]    There was a nearly seven year delay between Canellos I and the Secretary's remand. However, no interest accrued on the $2,816,029 liability during the pendency of the administrative proceedings.  (Doc. No. 45 at 20 n.13.)

analysis to demonstrate that some students did have "special circumstances" as that term is defined in section 1087tt(a). SLU also argued for hindsight application of other Title IV provisions to justify the awards granted. *See id*. at 4037.

After reviewing the submissions and the preexisting record, Judge Canellos reinstated SLU's liability. (R. at 4034-45.) Judge Canellos found that the record before him indicated that SLU "1) created per se categories of special circumstances for all medical and dental expenses, elementary and secondary tuition, and normal living expenses, and 2) found special circumstances for any student who completed [SLU's] supplemental form and reported expenses within any of these per se categories." *Id.* at 4038.

Judge Canellos found that, even if SLU reviewed the applications one by one in a "pro forma manner," there was no indication that SLU performed any analysis of individual situations or made any effort to consider whether a condition differentiated an individual student. (R. at 4038-39.) Thus, although it was "certainly possible that within [SLU's] student files, some students' reported circumstances may have constituted special circumstances," SLU's practice of considering "any and all instances where a student's family incurred expenses within a designated category as special circumstances" demonstrated that the university "neither conducted a case-by-case analysis nor considered only 'special' circumstances," as that term was defined in the statute. *Id.* at 4039.

Likewise, with respect to the statute's "adequate documentation" requirement, Judge Canellos found that "from the paucity of documents collected by [SLU], there

exists a significant lack of context from which to make determinations that special circumstances were present, even if the school had conducted an appropriate case-by-case analysis." (R. at 4041.)

Judge Canellos held that SLU could not cure these statutory violations by submitting post-hoc analysis, as it attempted to do in its Student-by-Student Analysis, because the record contained nothing to demonstrate that SLU conducted this analysis at the outset, before making the adjustments. (R. at 4039-40.)

Judge Canellos also rejected SLU's challenges to the methodology that the FSA used to calculate SLU's liability. SLU argued that the methodology was flawed because the FSA failed to meet its own guideline of a 95% confidence level, instead reaching only a 90% confidence level.[3] SLU also argued that even if a 90% confidence level were sufficient, the sample size for the 1994-1995 award year was too small to achieve a 90% confidence level. SLU argued that, according to a formula applied by the OIG in its audit of a different university, the sample size required to achieve a 90% confidence level for the 1994-1995 award year would have been 51 students, and the FSA's sample for that year was only 50 students.

Judge Canellos rejected each of SLU's arguments. Judge Canellos held that "[a]bsent demonstrated error, the use of sampling and extrapolation to assess liability will be upheld so long as a statistically reliable method of data analysis is employed and the institution . . . is afforded an opportunity to rebut the findings and technique of an audit."

---

[3]   As Judge Canellos explained, "[i]n audits conducted using a sampling methodology, a confidence level represents the level of precision or reliability for a statistical projection of liability from a sample of reviewed files." (R. at 4042 n.18.)

(R. at 4044.) In this case, Judge Canellos concluded that the FSA and OIG's methodology was shown to be statistically reliable and valid because there was no judicially-mandated minimum confidence level or sample size. Relying on a declaration by the OIG's statistical expert, Judge Canellos found that the OIG's protocol was to use a 90% confidence level for its audits, and the OIG was not bound by the particular sample size it used in an audit of a different university. (R. at 3863, 4044.) Judge Canellos held that although the FSA guidelines called for a 95% confidence level for audits performed solely by the FSA, this non-binding guideline was not dispositive in determining the statistical validity of an audit conducted initially by the OIG. Finally, Judge Canellos noted that SLU could have performed a full-file review and requested an alternate method of calculating liability, but SLU chose not to do so.

SLU appealed the Canellos II decision to the Secretary, who affirmed. The Secretary's affirmance constitutes the final agency action in this case. The Secretary agreed with SLU that in exercising professional judgment under section 1087tt(a), "financial aid administrators are not required to act as judges of whether prudent financial choices have been adopted by parents and/or students." (R. at 4220 n.7.) But he held that financial aid administrators are required to comply with the statute's two "key requirements": "[1] that professional judgment be exercised on the basis of adequate documentation and [2] that the professional judgment be exercised only under special circumstances followed by the financial aid administrator on a case-by-case basis." *Id.* at 4220.

The Secretary held that SLU failed to comply with these requirements. Rather

than determining whether special circumstances exist on a case-by-case and adequately documented basis, the Secretary found that SLU "executed a systematic practice of using professional judgment to override the statutory formula in any case in which a student requested a determination of special circumstances." *Id.* at 4221. Thus, SLU "departed from the statutory formula *regardless* of special circumstances, not *because* of special circumstances." *Id.*

The Secretary also affirmed the amount of SLU's liability. The Secretary held that the FSA's calculation of liability was reasonable, and SLU could not merely assert that the FSA's calculation was unfair or unacceptable without offering an appropriate alternative calculation. In any event, the Secretary held that the "extrapolation calculation [did] not hinge on the statistical validity of the student sample." (R. at 4223.) Rather, the Secretary found that the sample was used solely to determine whether SLU's "use of professional judgment systematically lacked statutory compliance." *Id.* Once systematic non-compliance was found, the "calculation of liability . . . was derived from a projection of the improper Pell Grant Awards" to the entire universe of 2,220 students. *Id.* The Secretary found that this method was apparently used "because of the audit finding that in *all* cases for whom professional judgment was performed during the award years at issue, [SLU's] professional judgment determinations were improper." *Id.* Thus, the Secretary found that the amount of SLU's liability was "based on the sum of the actual number of students awarded Federal Pell Grant funds by the exercise of professional judgment during the 1994-95 and 1995-96 award years multiplied by the average Pell Grant awarded: 779 x \$1,003 plus 1441 x \$1,412, respectively, which

yields, $2,816,029." *Id.* The Secretary ordered SLU to repay the Department the sum of $2,816,029.

SLU now seeks judicial review of the Secretary's final decision under the APA, 5 U.S.C. §§ 701-706. (Doc. No. 1 at 8.)

## ARGUMENTS OF THE PARTIES

As an initial matter, SLU argues that it did not grant a section 1087tt(a) adjustment every time a student requested it, as the Secretary found. Rather, SLU argues that it rejected some requests for adjustments during the 1994 to 1996 award years, but the auditors simply never reviewed those files. In support of this allegation, SLU cites the supplemental declaration of its financial aid director, Deuser, submitted during the administrative proceedings. In his supplemental declaration, Deuser states that SLU "rejected Professional Judgment application information in the 1994-95 and 1995-96 award years of this audit, and still does to this day." (R. at 3216.) However, Deuser does not identify the category of expenses to which these rejections related.

In any event, SLU argues that its policy decision to treat certain medical and dental, elementary and secondary school tuition, and living expenses as special circumstances was permitted by section 1087tt(a). SLU argues that, as Canellos I held, the OIG admitted SLU's conduct was permissible under section 1087tt(a) when it unsuccessfully sought to amend the statute. SLU reasons that by rejecting the OIG's legislative proposal and prohibiting the Department from regulating section 1087tt(a), Congress granted financial aid administrators the authority to interpret the statute.

Thus, SLU contends that its financial aid administrators had discretion to interpret

"ambiguous" statutory terms such as "special circumstances" and "adequate documentation," and SLU argues that "neither the Secretary nor a reviewing court can reject [the administrators'] interpretation . . . in favor of his or its own opinion as to what the statute means."  (Doc. No. 41 at 36.)  SLU asserts that its financial aid administrators' interpretation of section 1087tt(a) was reasonable because, for example, "it is self-evident, especially for a private Catholic, Jesuit University such as SLU, that whether to exercise Professional Judgment for the parents of children who attend a private or parochial school rather than a public primary or secondary school is one of the core elements of Professional Judgment."  (Doc. No. 41 at 48.)

Moreover, SLU argues that the use of per se categories of special circumstances was contemplated by the Department in its own advisory documents, and was ultimately adopted by Congress in later amendments to section 1087tt(a).  Specifically, SLU points to a 1999 "Dear Colleague Letter" sent by the Department to universities participating in Title IV programs, which stated that "[p]rofessional judgment authority may be used in other ways to assist students with special circumstances such as for elementary or secondary school tuition expenses, unusual medical or dental expenses, or unusual changes in income or assets."  (R. at 369.)  And SLU notes that Congress later amended section 1087tt(a) to explicitly state that "[s]pecial circumstances may include tuition expenses at an elementary or secondary school, medical, dental or nursing home expenses not covered by insurance," and other categories of expenses.  20 U.S.C. § 1087tt(a) (2008).  SLU argues that this amendment "makes it clear that each per se category of expense could be considered a special circumstance."  (Doc. No. 41 at 50.)

SLU also argues that the Secretary's finding that *all* of SLU's award adjustments violated section 1087tt(a) improperly ignored the OIG's finding that some of SLU's adjustments were appropriate exercises of professional judgment, and were adequately documented.

Next, SLU challenges the methodology used to calculate its liability. SLU argues that the Secretary misconstrued the methodology employed by the FSA, and erred in holding that the $2,816,029 liability was calculated by first finding that all of SLU's section 1087tt(a) adjustments were improper and then multiplying the total number of awards benefitting from a section 1087tt(a) adjustment by the average award amount. Rather, SLU argues, the FSA calculated liability by determining some, *but not all*, of SLU's section 1087tt(a) adjustments were improper, and then extrapolating the amount of improperly disbursed funds found in the sample files to the total number of awards benefitting from a section 1087tt(a) adjustment. SLU argues that "because the basis upon which the Secretary affirmed the extrapolated liability is not the basis upon which that figure was actually calculated, the Secretary's Decision must be vacated as a matter of law." (Doc. No. 41 at 56.)

SLU also argues that the Secretary erred in rejecting its challenges to the audit's confidence level and sample size. SLU does not dispute that extrapolation is an acceptable method of quantifying liability. But SLU maintains that the FSA must be held to its self-imposed guideline of a 95% confidence level. In support of this argument, SLU cites the FSA's 1994 Program Review Guide, published by the FSA's Institutional Review Branch, which includes as "recommended language" for reports, that student

files should be "selected randomly from a statistical sample . . . valid to a 95 percent confidence level with a plus or minus five percent confidence interval." (R. at 3683-84.) SLU also argues that even if a 90% confidence level is appropriate, the sample size of 50 for the 1994-95 award year was too small to achieve a 90% confidence level. As it did in the administrative proceedings, SLU points to a formula applied by the OIG in an audit of a different university to argue that a sample size of 51 was necessary.

Finally, SLU argues that there are other, unspecified errors in the calculation of liability with respect to particular students. As one example, SLU argues that the FSA improperly included in its extrapolation part of one student's Pell Grant that was not the result of a section 1087tt(a) adjustment. This student was designated as Student GR-2-043 in the final audit determination. SLU has not provided any other examples of errors but argues that the Court must remand the case to the Secretary to review each student's file and determine the correct amount of liability. SLU states that its Student-by-Student Analysis submitted during the administrative proceedings, which was created post-hoc, sets out SLU's view as to the correct disbursement for each student.

The Department responds that the Secretary's decision is supported by the plain language of section 1087tt(a). The Department argues that SLU's use of per se special circumstances violates the statute's case-by-case and adequate documentation requirements, and is contrary to the statutory definition of special circumstances. The Department contends that, regardless of any agency guidance documents or statutory amendments listing examples of expenses that "may" warrant a section 1087tt(a) adjustment, SLU cannot make any adjustment without first fulfilling the statutory

requirement to conduct an individualized and adequately documented review.

Regarding SLU's contention that it did not automatically award adjustments to every student who requested one, the Department argues that it was incumbent upon SLU to demonstrate this fact in developing the administrative record, and it failed to do so. The Department notes that Deuser did not substantiate the statement in his supplemental declaration that SLU rejected some requests for adjustments, and this statement was contradicted by other evidence in the record.

Regarding SLU's emphasis on the OIG's unsuccessful legislative proposal, which was the focus of Canellos I, the Department argues that the Secretary properly ignored the proposal. According to the Department, the OIG's legislative proposal is irrelevant because the final audit determination "did not assess liability using the standards OIG proposed to Congress, nor did the Secretaries affirm on that basis." (Doc. No. 45 at 30.)

Likewise, the Department argues that the Secretary properly disregarded the OIG's findings that SLU appropriately exercised and adequately documented professional judgment in at least some cases. The Department acknowledges that "there are a handful of students, out of the 139 sampled, as to whom the OIG concluded SLU had at least in part correctly exercised professional judgment," and that the final audit determination did not assess liability with respect to at least some of these awards. (Doc. No. 45 at 27.) However, the Department argues that the OIG's decision to accept these adjustments was "improper" because it was made after auditors determined whether students "would have warranted an exercise of professional judgment *had SLU ever engaged in the requisite individualized analysis professional judgment required*." *Id.* at

28.  Because SLU did not engage in such analysis, the Department argues that "[n]either SLU, nor the Department, could effect a valid exercise of professional judgment authority post hoc, or based on documents in SLU's student files concerning students as to whom no such inquiry had been made when the funds were awarded."  *Id.*  at n.18.  In short, the Department argues that the Secretary properly held that, because SLU systematically failed to comply with section 1087tt(a), *all* of SLU's award adjustments in the years at issue were improper.

Regarding SLU's methodology challenges, the Department acknowledges that the FSA's calculation of liability was not based on the assumption that all of SLU's section 1087tt(a) adjustments were improper, as the Secretary held.  This is because, as explained above, the final audit determination (erroneously, according to the Department) accepted some of SLU's section 1087tt(a) adjustments as appropriate when calculating the total amount of improperly disbursed funds found in the sample files.  Nevertheless, the Department argues that this fact does not undermine the Secretary's decision because "[t]he Secretary's decision did not turn on whether or not the [final audit determination] assessed liability for every penny it should have."  *Id.* at 28.  The Department argues that, although there may be some conflict between the Secretary's finding that all of SLU's section 1087tt(a) adjustments were improper and the final audit determination's allowance of certain section 1087tt(a) adjustments, any error in this regard actually benefitted SLU.  The Department notes that had Secretary's finding of across-the-board liability been applied, all of SLU's section 1087tt(a) adjustments would have been disallowed, and  the amount of SLU's liability would have been even greater than

$2,816,029.

The Department also argues that the Secretary properly rejected SLU's challenges based on confidence level and sample size. The Department argues that Title IV does not mandate a minimum confidence level or sample size for final audit determinations, and the methodology employed in this case was shown to be statistically reliable and valid by the OIG's statistical expert. The Department also notes that, as Judge Canellos found in Canellos II, SLU could have performed a full-file review and proposed an alternative calculation of liability, or rebutted the FSA's evidence of reliability and validity with its own statistical expert, but SLU chose not to do either.

Finally, the Department argues that the Court should reject SLU's alternative request to remand the matter for correction of other particular errors because SLU failed to make any showing to the Secretary regarding what the correct amount of liability should have been and why. With respect to Student GR-2-043, the single example of error cited by SLU, the Department argues that it correctly included the student's entire Pell Grant in its calculation of liability because, absent SLU's improper section 1087tt(a) adjustment, the student's EFC would have made him ineligible for any Pell Grant. In its reply brief, SLU does not respond to the Department's explanation with respect to Student GR-2-043.

## DISCUSSION

The parties state, and the Court agrees, that the Secretary's final decision is a final agency action subject to this Court's review under the APA, 5 U.S.C. §§ 701-706. *See also Sistema Universitario Ana G. Mendez v. Riley*, 234 F.3d 772, 777 (1st Cir. 2000)

(reviewing Secretary of Education's decision regarding Title IV final audit determination under the APA).

"It is well-established that judicial review under the APA is limited to the administrative record that was before the agency when it made its decision." *Rochling v. Dep't of Veterans Affairs*, 725 F.3d 927, 936 (8th Cir. 2013). Neither party in this case has asked the Court to review any evidence outside the administrative record.

Under the APA, a reviewing court must affirm the agency action unless it was "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law," or was "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A), (C). Reviewing courts must also "accept the agency's factual findings if they are supported by substantial evidence." *Maverick Transp., LLC v. U.S. Dep't of Labor, Admin. Review Bd.*, 739 F.3d 1149, 1153 (8th Cir. 2014); 5 U.S.C. § 706(2)(E). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the agency's conclusion." *Maverick*, 739 F.3d at 1153 (citation omitted).

SLU asserts errors with respect to both the Secretary's finding of liability and the Secretary's calculation of the amount of liability. The Court will address each of these issues in turn.

I.      **Secretary's Finding of Liability Under Section 1087tt(a)**

## A.  Secretary's Interpretation of Section 1087tt(a)

The first question before the Court is whether the Secretary properly construed section 1087tt(a) to prohibit SLU's financial aid administrators from treating any and all instances where a student's family incurred expenses within a designated category as special circumstances warranting an adjustment to the statutory need analysis formula.

In reviewing an agency's interpretation of a statute it administers, courts must ask two questions.  First "is the question whether Congress has directly spoken to the precise question at issue." *Chevron, U.S.A., Inc. v. Natural Res. Def. Council, Inc.*, 467 U.S. 837, 842 (1984).  "If a court, employing traditional tools of statutory construction, ascertains that Congress had an intention on the precise question at issue, that intention is the law and must be given effect." *Id.* at 843 n.9.

If, on the other hand, the statute is silent or ambiguous with respect to the specific issue, courts must reach a second question: whether Congress has explicitly or implicitly "left a gap for the agency to fill" by regulation. *Id*. at 843-44.  "[W]hen it appears that Congress delegated authority to the agency generally to make rules carrying the force of law, and that the agency interpretation claiming deference was promulgated in the exercise of that authority," the agency interpretation controls unless it is "procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute." *United States v. Mead Corp.*, 533 U.S. 218, 226-27 (2001).  But when there has been no such delegation of authority, the agency interpretation is "entitled to respect only to the extent it has the power to persuade." *Gonzales v. Oregon*, 546 U.S. 243, 256 (2006) (citation omitted).

As an initial matter, the Court rejects SLU's novel argument that its financial aid administrators are entitled to the deference that would normally be afforded agencies under *Chevron* and its progeny. SLU is correct that, although Congress has delegated authority to the Secretary to administer and enforce Title IV, Congress has expressly restricted that authority in the area of need analysis, including section 1087tt(a). Therefore, to the extent the Court finds any ambiguity in section 1087tt(a), it need not defer to the Secretary's interpretation.

But this does not mean that the Court must defer to SLU's interpretation. The principle of deference to administrative interpretations under *Chevron* and its progeny is based on a recognition that "[t]he power of an administrative agency to administer a congressionally created program necessarily requires the formulation of policy and the making of rules to fill any gap left, implicitly or explicitly, by Congress," and the formulation of that policy might require "more than ordinary knowledge respecting the matters subjected to agency regulations." *Chevron*, 467 U.S. at 843-44 (citation omitted).

Congress has not delegated participating institutions like SLU any such broad, gap-filling authority to administer Title IV. Rather, Congress has required participating institutions to submit to agency oversight for compliance with Title IV's provisions. Section 1087tt(a) may afford financial aid administrators some amount of discretion to make adjustments to the need analysis formula, but this discretion is limited by certain express conditions, and the statute does not afford administrators any discretion to define or interpret those conditions. Therefore, the Court rejects SLU's call for deference.

In any event, the Court need not reach the question of deference, to any party,

because Congress' intent may be ascertained from the plain language of section 1087tt(a) and traditional tools of statutory construction.

Section 1087tt(a) expresses the unambiguous congressional intent that financial aid administrators must satisfy certain conditions precedent before adjusting the statutory need analysis formula for an individual student. Specifically, financial aid administrators are not permitted to deviate from the statutory formula in the absence of "special circumstances." 20 U.S.C. § 1087tt(a) (1994). The definition of "special circumstances" is not left to the unbridled discretion of administrators but is limited to "conditions that differentiate an individual student from a class of students rather than conditions that exist across a class of students." *Id.* And these special circumstances must be determined on a "case-by-case basis" and substantiated by "adequate documentation." *Id.*

To automatically treat any and all instances in which a student's family incurred expenses within a designated category as special circumstances is, by definition, to fail to conduct a case-by-case analysis to determine whether the condition differentiates an individual student.

Moreover, section 1087tt(a) does not exist in a vacuum. It must be read in the context of the extremely detailed statutory scheme Congress created to control the amount of and circumstances under which federal funds may be disbursed to assist students with financial need. *See Deal v. United States*, 508 U.S. 129, 132 (1993) ("[A] fundamental principle of statutory construction (and, indeed, of language itself) [is] that the meaning of a word cannot be determined in isolation, but must be drawn from the

context in which it is used."); *Robinson v. Shell Oil Co.*, 519 U.S. 337, 341 (1997) ("The plainness or ambiguity of statutory language is determined by reference to the language itself, the specific context in which that language is used, and the broader context of the statute as a whole."). Title IV's need analysis provisions, including its strict parameters for the calculation of EFC and its annually updated maximum deductions for family living expenses, further signal that section 1087tt(a) was not intended to serve as an avenue for financial aid administrators to create, according to their own policy preferences, entire categories of expenses to be automatically deducted from EFC.

Therefore, applying the traditional tools of statutory interpretation, the Court finds that SLU's policy of treating certain categories of expenses as per se special circumstances violates the plain language of section 1087tt(a).

SLU points to the legislative history and subsequent amendments of section 1087tt(a) to argue that the statute permits its conduct. Although the Court need not resort to this extrinsic evidence in light of the unambiguous language of the statute, a diversion into legislative history only supports the plain meaning of the statute's text.

First, SLU notes that a House Committee Report accompanying the 1992 amendments to section 1087tt(a) stated that "the Committee recognize[d] that although adjustments must be made on an individual case-by-case basis, students may have similar circumstances which make similar adjustments appropriate." H.R. Rep. No. 102-447, at 72 (1992), *reprinted in* 1992 U.S.C.C.A.N. 334, 405. But this statement merely recognizes that nothing in the statute prohibits the *result*—after financial aid administrators have made adjustments on an individualized, case-by-case basis—that

some students receive similar adjustments. What is prohibited is for financial administrators to assume this result without first conducting the individualized, case-by-case analysis required to get there.

Indeed, as the Department correctly notes, the conference report accompanying the originally enacted section 1087tt(a)[4] reveals that Congress considered, but rejected, the idea of permitting financial aid administrators to make adjustments on a group basis. *See* H.R. Rep. No. 99-861, at 416-17 (1986) (Conf. Rep.), *reprinted in* 1986 U.S.C.C.A.N. 2718, 2773 ("The House amendment and the Senate bill permit financial aid administrators to exercise discretion to make adjustments to [the statutory formula], however, the Senate bill limits the exercise of such discretion to individual students, while the House amendment permits it to be exercised for groups of students. The House recedes."). And to clarify that special circumstances must be determined on an individualized basis, the 1992 amendments to section 1087tt(a) added the "case-by-case" requirement and explicitly defined special circumstances as "conditions that differentiate an individual student from a class of students rather than conditions that exist across a class of students." *Compare* 20 U.S.C. § 1087tt(a) (1986), *with* 20 U.S.C. § 1087tt(a) (1992). Therefore, the legislative history of section 1087tt(a) supports the plain meaning

---

[4]    As originally enacted in 1986, section 1087tt(a) stated, in relevant part:

> Nothing in this title shall be interpreted as limiting the authority of the student financial aid administrator, on the basis of adequate documentation, to make necessary adjustments to the cost of attendance and expected student or parent contribution (or both) to allow for treatment of individual students with special circumstances.

20 U.S.C. § 1087tt(a) (1986).

of the statutory text, which prohibits treating certain categories of expenses as per se special circumstances.

The subsequent amendments to section 1087tt(a) do not alter this conclusion. SLU correctly notes that the 1998 and later amendments to section 1087tt(a), as well as the Department's own guidance documents, state that certain categories of expenses, such as elementary and secondary school tuition and medical and dental expenses, "may" constitute special circumstances. *See* R. at 369; 20 U.S.C. § 1087tt(a) (1998); 20 U.S.C. § 1087tt(a) (2008).

But listing examples of conditions that "may" qualify as special circumstances does not equate to creating per se categories of circumstances in which adjustments are automatically made, regardless of whether it has been determined, on a case-by-case and adequately documented basis, that the individual circumstances of that student, as compared to a class of students, warrant a departure from the statutory formula. The latter is prohibited under all versions of the statute.

The Court concludes that the plain language of section 1087tt(a), as well as its legislative history, supports the Secretary's interpretation that the statute prohibited SLU's financial aid administrators from treating certain categories of expenses as per se special circumstances.

### B. Secretary's Factual Finding that SLU's Financial Aid Administrators Systematically Made Adjustments Based on Per Se Categories of Special Circumstances

The Secretary's factual finding that SLU's financial aid administrators systematically treated all expenses reported in certain designated categories as special

circumstances warranting an adjustment is supported by substantial evidence. This evidence includes SLU's own statements during the Canellos I hearing, Deuser's declaration, and the OIG's audit work papers.

Although Deuser later submitted a supplemental declaration stating that SLU did not grant every request for a finding of special circumstances that it received, Deuser did not cite or attach any evidence in support of this statement. Nor did Deuser state whether any of these purported rejections were for medical and dental, elementary and secondary school tuition, or living expenses, such that they would undermine the Secretary's finding that SLU treated these expenses as per se special circumstances.

Indeed, despite Judge Canellos's explicit order for SLU to submit any evidence that it conducted a case-by-case, individualized review before granting section 1087tt(a) adjustments in the award years at issue, the administrative record does not include any such evidence.[5] Therefore, the Court is bound by the Secretary's factual finding that SLU systematically made section 1087tt(a) adjustments on the basis of per se categories of special circumstances.

---

[5] In its Student-by-Student Analysis in the administrative proceedings and in its brief before this Court, SLU attempts to demonstrate, retrospectively, that the students at issue had "special circumstances" as that term is defined in section 1087tt(a). *See, e.g.*, Doc. No. 41 at 20 (explaining circumstances of a student whose parent lost his job and whose sister was disabled). But this post-hoc analysis is irrelevant to the Court's review. The Secretary found that SLU failed to conduct this individualized analysis *before* making the adjustments, and the Court need only determine whether this finding is supported by substantial evidence. *See Bennett v. New Jersey*, 470 U.S. 632, 646 (1985) ("The role of a court in reviewing a determination by the Secretary that funds have been misused is to judge whether the findings are supported by substantial evidence and reflect application of the proper legal standards."). "Where the Secretary has properly concluded that funds were misused under the legal standards in effect when the grants were made," as here, "a reviewing court has no independent authority to excuse repayment based on its view of what would be the most equitable outcome." *Id.*

### C. Effect of the OIG's Legislative Proposal and Initial Audit Findings

Because this Court's review is limited to the Secretary's final decision, and the findings therein, the findings of lower level agency officials such as the OIG and FSA are irrelevant except to the extent they are incorporated in the Secretary's decision. *See Morris v. Sullivan*, 897 F.2d 553, 559 (D.C. Cir. 1990) ("Courts do not normally review the interim actions of . . . lower level agency officials. Rather, they review final agency decisions.").

Nor is the OIG's legislative proposal, on which SLU places much emphasis, pertinent to the Secretary's finding of liability. As the Department correctly notes, the Secretary did not assess liability using the "necessity" standards that OIG proposed to Congress. The Secretary agreed with SLU that, in rejecting the OIG's legislative proposal, Congress ensured that nothing in section 1087tt(a) would require financial aid administrators to make judgment calls regarding whether the adjusted expenses were incurred out of necessity.[6] *See* R. at 4219-20 n.7.

Rather, the Secretary found that section 1087tt(a) requires only that financial aid administrators conduct a case-by-case determination and obtain adequate documentation of the "special circumstances—whatever those circumstances may be—that form the basis of the judgment to depart from the statutory need analysis formula." *Id.* at 4220

---

[6]     For this reason, just as SLU's post-hoc analysis regarding some students with particularly adverse circumstances is irrelevant to the Court's review, so are the Department's examples of particularly wealthy students for whom SLU more drastically adjusted the statutory formula. *See, e.g.*, Doc. No. 45 at 18 n.12 (noting that SLU reduced the EFC of one student "from $24,102 to $384" after "deducting an additional $82,100 of living expenses" on top of the statutory income protection allowances, "even though the student's family income was $100,996, and the family indicated that it could pay $8000 towards the daughter's educational costs").

n.7.  The OIG's legislative proposal did not address whether SLU complied with these

statutory prerequisites, and there is substantial evidence to support the Secretary's finding

that it did not.

Likewise, the OIG's findings in its initial audit, in which it accepted some of

SLU's award adjustments as proper and/or adequately documented exercises of

professional judgment, are irrelevant to the Court's review.  The basis for the Secretary's

decision was not whether the award adjustments were warranted by facts in each case,

but whether SLU's financial aid administrators complied with the statutory prerequisites

prior to making the adjustments.  The Secretary found that they did not, and as discussed

above, this finding is supported by substantial evidence and reflects application of the

proper legal standards.  Therefore, the Court will affirm the Secretary's finding that SLU

violated section 1087tt(a).

**II.**     **Secretary's Calculation of Amount of Liability**

 **A. Errors Arising from Conflict Between Secretary's Reasoning and Final**
  **Audit Determination's Calculation of Liability**

As SLU correctly notes, the final audit determination only assessed liability for an

estimated 2,016 of the 2,200 section 1087tt(a) adjustments in the award years at issue,

whereas the Secretary found that SLU's systematic noncompliance with section 1087tt(a)

meant that all 2,220 of the adjustments were improper.  Under the Secretary's reasoning,

which this Court has upheld, SLU arguably could have been ordered to repay more than

$2,816,029.  But the fact that the Secretary did not assess liability to the full extent

permitted by Title IV only benefitted SLU.  If this is an error, it is not one warranting

reversal of the Secretary's decision.  *See* 5 U.S.C. § 706 (noting that courts reviewing

agency action under the APA must take "due account . . . of the rule of prejudicial error"); *Jicarilla Apache Nation v. U.S. Dep't of Interior*, 613 F.3d 1112, 1121 (D.C. Cir. 2010) ("[I]f the agency's mistake . . . did not prejudice the petitioner, it would be senseless to vacate and remand for reconsideration".).  The Secretary's finding that SLU is liable for *at least* $2,816,029 is supported by substantial evidence.

### B.  Errors Based on Confidence Level and Sample Size

In reviewing the Secretary's calculation of liability as stated in the final audit determination, "the task of the reviewing court is not to determine whether the accounting method employed by the Secretary is better or more accurate than the method proposed by [the petitioner], but rather, whether it is arbitrary, capricious, or contrary to law." *Trs. of Calif. State Univ*, 74 F.3d at 966.

Nothing in Title IV or the Department's regulations mandates a particular computing method for final audit determinations.  Nor is there any binding authority prescribing a minimum sample size or confidence level.  The most SLU offers to contradict the Secretary's calculation of liability is "recommended" language referencing a higher confidence level in non-binding Department guidance documents, and a non-mandatory formula applied by the OIG in its audit of a different university.  But these documents did not require the Secretary to overturn the FSA's otherwise statistically reliable and valid calculation of liability.

The assumptions underlying the final audit determination's statistical analysis and the calculations upon which it depended were explained in detail in the evidence before the Secretary, including in an appendix to the final audit determination and a declaration

from a statistical expert employed by the OIG. *See* R. at 240-48; 3863-64. SLU did not rebut this evidence or offer any other affirmative evidence to demonstrate that the statistical methodology employed in the final audit determination was invalid or unreliable. Nor did SLU offer an alternative calculation of its liability, despite having the opportunity to perform a full-file review.

For these reasons, the Court finds that the Secretary's calculation of liability was neither arbitrary nor capricious. *See GoJet Airlines, LLC v. F.A.A.*, 743 F.3d 1168, 1170-71 (8th Cir. 2014) (explaining that agency action is not arbitrary or capricious unless the agency relied on factors Congress did not intend it to consider, failed to consider an important aspect of the problem, offered an explanation that runs contrary to the evidence before it, or is so implausible that it could not be ascribed to a difference in view or a product of agency expertise); *see also Chauffeur's Training School, Inc. v. Spellings*, 478 F.3d 117, 132 (2d Cir. 2007) (affirming the Department of Education's assessment of liability where its statistical calculation and analysis was explained in record and "[t]he School was free to offer competing statistical evidence (which it did not do) and to argue any claimed defects in the Department's analysis").

## C. Alternative Request to Remand

The Court likewise rejects SLU's alternative request to remand the matter to correct purported errors in the calculation of liability with regard to particular students. The Court agrees with the Department that it was SLU's burden to demonstrate any errors in the calculation of its liability during the administrative proceedings. 34 C.F.R. §

668.116(d) (placing burden on petitioner to show each expenditure questioned or disallowed was proper).

SLU claims it met this burden by submitting its Student-by-Student Analysis. But as discussed above, the Student-by-Student Analysis merely argued that each of SLU's award adjustments could be retrospectively justified under section 1087tt(a) or other provisions of Title IV. Because these post-hoc justifications did not demonstrate that SLU complied with Title IV before disbursing federal funds, the Student-by-Student Analysis did not satisfy SLU's burden to demonstrate any expenditure was proper.

And SLU has not identified any other specific error in the Secretary's calculation that would warrant a reduction in liability. With respect to the sole error initially identified by SLU, regarding Student GR-2-043, SLU has not contested the Department's explanation that liability was correctly assessed because, without the benefit of a section 1087tt(a) adjustment, this student's EFC disqualified him for a Pell Grant. Therefore, there is no basis for remand.

## **CONCLUSION**

For the reasons set forth above, the Court finds that the Secretary's decision is supported by substantial evidence and reflects application of the proper legal standards.

Accordingly,

**IT IS HEREBY ORDERED** that the relief which Plaintiff St. Louis University seeks in its Complaint and in its Memorandum in Support of its Request for Relief is **DENIED**. (Doc. Nos. 1 & 41.)

**IT IS FURTHER ORDERED** that the final decision of the U.S. Secretary of Education is **AFFIRMED**.

A separate Judgment shall accompany this Memorandum and Order.


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 17th day of March, 2015.